IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. GRAVES


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

MICHAEL J. GRAVES, APPELLANT.


Filed October 6, 2015.    No. A-14-1140.


Appeal from the District Court for Sarpy County: MAX KELCH, Judge. Affirmed.

Patrick J. Boylan, Chief Deputy Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.


PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Michael J. Graves appeals from his conviction of terroristic threats, a Class IV felony. Graves contends that the district court for Sarpy County erred in failing to instruct the jury on the offense of intimidation by telephone call, which he argues is a lesser-included offense of terroristic threats. He also argues that the court erred in failing to answer a question from the jury before the jury returned a verdict, and he challenges the sufficiency of the evidence. For the following reasons, we affirm.

BACKGROUND

On July 31, 2014, Graves was charged by information with one count of terroristic threats in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 2008) in that on April 20 he threatened to commit a crime of violence with the intent to terrorize Donna Berryman. He was also charged with one count of stalking in violation of Neb. Rev. Stat. § 28-311.03 (Reissue 2008) based on his alleged harassment of Berryman from April 20 to 27.

- 1 -

A jury trial was held on October 23 and 24, 2014. Sergeant Howard Banks of the Bellevue police department testified that on April 27 he responded to a report of harassment at a home in Bellevue, Nebraska, where he met with Berryman and her husband and daughter. Berryman reported that Graves, her ex-husband, had threatened her via text message and voicemail. Sergeant Banks viewed the text messages and listened to the two voicemails. He identified exhibit 5 as a CD with two files: (1) a file containing a typed transcription of the text messages between Berryman and Graves and (2) a file containing a series of "screen shots" from Berryman's phone showing the text messages.

Berryman testified that she married Graves in 1998 and divorced him in 2004. During the marriage, she and Graves had three children together, who were ages 24, 22, and 15 at the time of trial. Following the divorce, Graves relocated to Arizona, where he continued to reside at the time of the events in this case.

According to Berryman, on April 20, 2014, she was at home when she received a text message from Graves stating "it's Easter Sunday." Berryman responded, asking what he meant by that. Graves then called Berryman's phone, and the two spoke for half an hour. The call ended when Berryman's phone battery died. That night, Graves continued to send text messages and leave voicemails.

Berryman identified exhibit 1 as a CD containing recordings of the voicemails and phone call. During the phone call, which was played for the jury, Graves referenced that he had paid $45,000 in child support in the past 4 or 5 years and repeatedly told Berryman that if she paid him $45,000 or $50,000, he would "walk away" from his 15-year-old daughter. At various points, Graves said, "I know where you're at," "I will come and find you," "I have nothing here in Phoenix," and "We'll do it the hard way."

The voicemail messages were then played for the jury. In one of the voicemail messages, Graves said, "I will find you and I will shoot you up with an AK-47 or whatever."

Berryman also testified concerning the text messages she received from Graves on April 20, 2014. In one series of text messages, Graves wrote, "50k!," "50k!," "50k!," "50 graves!," "50 graves!," "50 graves!," which Berryman interpreted as meaning "50 graves in the ground or $50,000." At another point, Graves texted "50' [*sic*] grand/graves" three times.

Berryman testified that she did not contact police until April 27, 2014, one week after she received the text messages and voicemails, because Graves again texted her on that date.

On cross-examination, Berryman testified that since their divorce in 2004, the only time that she had seen Graves in person was at her son's marine boot camp graduation in 2010. She further testified that her new husband wanted to adopt her 15-year-old daughter and that Berryman and her new husband had asked Graves if he would be willing to relinquish his parental rights to his daughter. Regarding Graves' AK-47 comment on the voicemail, Berryman admitted that she had "made such an allegation in a 2010 protection order." After defense counsel asked Berryman if that was what Graves was referencing when he made the comment, the court sustained an objection on grounds that it called for speculation.

After the State rested, Graves testified on his own behalf. He explained that his phone call with Berryman on April 20, 2014, concerned Berryman's husband "always wanting to adopt [Graves'] daughter when [Graves has] years of child support invested with no visitation." The

references to an agreement during the phone call concerned Berryman's request for Graves to relinquish his parental rights to his daughter so that Berryman's husband could adopt her. Graves explained that his use of the phrase "50 graves" in the text messages related to the fact that Berryman had changed his daughter's name from Graves to Berryman. Graves "was ranting basically [that he] wanted [his] daughter's name changed back."

Regarding the AK-47 comment in the voicemail message, Graves testified that he was referring to a time when Berryman accused him of making a similar threat. Graves was "mimicking" Berryman. Graves testified that Berryman made the prior allegation in a 2010 protection order, and he denied having any intention to terrorize Berryman or return to Nebraska to shoot Berryman with an AK-47.

At a jury instructions conference following the close of evidence, defense counsel tendered an instruction treating intimidation by telephone call as a lesser-included offense of terroristic threats. The court declined to give the instruction.

During its deliberations, the jury sent a note to the court asking the following question: "Can the jury get a copy of the transcript of the txt messages? There is a gap in the times/conversation of the txt messages that occurred on the 27th." The court conferred with counsel and drafted a supplemental instruction stating that any information concerning the text messages was contained in exhibit 5.

Before the court delivered the supplemental instruction to the jury, the bailiff advised the court that the jury had reached verdicts on both counts. The court brought the jury into the courtroom, where the jury returned verdicts finding Graves guilty of terroristic threats and not guilty of stalking. The court sentenced Graves to 18 to 24 months in prison, and Graves timely appealed to this court.

ASSIGNMENTS OF ERROR

Graves assigns that the district court erred (1) when it refused to instruct the jury on the offense of intimidation by telephone call as a lesser-included offense of terroristic threats and (2) by not answering the jury's question before receiving the jury's verdicts; Graves also assigns as error (3) that the State failed to present sufficient evidence to convict Graves of terroristic threats.

STANDARD OF REVIEW

Whether a court's jury instructions were correct is a question of law. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013). On a question of law, we are obligated to reach a conclusion independent of the determination of the court below. *Id.*

Whether to recall a jury after it has retired for deliberations is a matter entrusted to the discretion of the trial court. *Sedlak Aerial Spray v. Miller*, 251 Neb. 45, 555 N.W.2d 32 (1996). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the

finder of fact. *Id*. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

ANALYSIS

*Lesser-Included Offense Instruction*.

Graves' first assignment of error is that the district court erred when it refused to instruct the jury, as he proposed, on the offense of intimidation by telephone call as a lesser-included offense of terroristic threats. The Nebraska Supreme Court has held that a court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *State v. Sinica*, 277 Neb. 629, 764 N.W.2d 111 (2009).

As pertinent here, a person commits terroristic threats if he or she threatens to commit any crime of violence with the intent to terrorize another. § 28-311.01(1). Also as pertinent here, a person commits intimidation by telephone call if, with intent to terrify, intimidate, threaten, harass, annoy, or offend, the person telephones another and threatens to inflict injury to any person or to the property of any person. Neb. Rev. Stat. § 28-1310(1)(c) (Reissue 2008).

A comparison of the elements of the two offenses reveals that one can commit terroristic threats without simultaneously committing the lesser offense of intimidation by telephone call. Simply put, terroristic threats does not require that the perpetrator communicate his or her threat via telephone, while intimidation by telephone call does require it. As the State argues, simply because Graves used a telephone to commit terroristic threats in this case does not mean that intimidation by telephone call is a lesser-included offense of terroristic threats. See *State v. Smith*, 267 Neb. 917, 920, 678 N.W.2d 733, 736 (2004) (explaining that in applying the statutory elements test "a court looks to the statutory elements of each crime rather than the particular facts of a specific case"); *State v. Williams*, 243 Neb. 959, 965, 503 N.W.2d 561, 565 (1993) ("[I]n determining whether an offense is indeed a lesser-included one, a court initially does not look to the evidence in the particular case, but, rather, as the name of the statutory-elements rule implies, looks only to the elements of the criminal offense.").

*State v. Willett*, 233 Neb. 243, 444 N.W.2d 672 (1989), on which Graves relies, is inapposite. In *Willett*, the defendant was charged with terroristic threats after he told his wife during a phone call that he would "hunt her down and kill her" if she did not return his son. *Id*. at 245, 444 N.W.2d at 674. In addition to instructing on terroristic threats, the trial court instructed the jury on the offense of intimidation by telephone call, although it did not do so at the defendant's request. After being convicted of terroristic threats, the defendant appealed, arguing that while he may have committed intimidation by telephone, his conduct was not of the type that the terroristic threats statute was intended to prohibit. The Nebraska Supreme Court rejected this argument, reasoning that the defendant's conduct violated the unequivocal terms of the terroristic threats statute. *Id*. The court noted that while the defendant's conduct may have also constituted

intimidation by telephone, this was not a ground for reversing his conviction of terroristic threats. *Id.*

*Willett* is inapposite because the Nebraska Supreme Court did not address whether intimidation by telephone was a lesser-included offense of terroristic threats. While the court noted that the jury received an instruction on intimidation by telephone, the court did not refer to the offense as a lesser-included offense of terroristic threats. Indeed, nothing in *Willett* suggests that a defendant charged with terroristic threats is entitled to an instruction on the offense of intimidation by telephone.

We find no error in the district court's refusal to instruct on the offense of intimidation by telephone as requested by Graves.

*Failure to Answer Jury's Question.*

Graves' second assignment of error is that the district court erred in failing to answer the jury's question before the jury returned its verdicts. As stated above, the jury asked the following question: "Can the jury get a copy of the transcript of the txt messages? There is a gap in the times/conversation of the txt messages that occurred on the 27th." The court drafted a supplemental instruction stating that any information concerning the text messages was contained in exhibit 5, but the jury reached verdicts on both counts before the court delivered the instruction.

A court is authorized by statute to give additional instructions after the jury has begun deliberations. See Neb. Rev. Stat. § 25-1116 (Reissue 2008); *State v. Hudson*, 277 Neb. 182, 761 N.W.2d 536 (2009). The proper practice is to call the jury into open court and to give any additional instructions in writing in the presence of the parties or their counsel. *Hudson, supra*. Whether to recall a jury after it has retired for deliberations is a matter entrusted to the discretion of the trial court. *Sedlak Aerial Spray v. Miller*, 251 Neb. 45, 555 N.W.2d 32 (1996).

We find no abuse of discretion by the district court for several reasons. As an initial matter, the district court did not decline to answer the jury's question; rather, it drafted a supplemental instruction but was unable to deliver it before the jury reached its verdicts. It is clear from the context that the jury felt comfortable reaching its verdicts without first hearing the court's answer to its question. We cannot say that the court abused its discretion under these circumstances.

Furthermore, the supplemental instruction drafted by the court essentially was a statement to the jury that it had all of the evidence before it. It is difficult to imagine how Graves could have been prejudiced by any failure on the court's part to deliver the instruction before the verdict was reached; an instruction to consider the evidence before it could not have had any effect on the jury's verdicts.

Finally, because the record before us does not include the instructions actually given to the jury, it would be difficult to conclude that Graves was prejudiced by any failure on the court's part to deliver the supplemental instruction. When reviewing a challenge to jury instructions, a court must read all the instructions together, and if taken as a whole they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Merchant*, 288 Neb. 439, 848 N.W.2d 630 (2014). Without seeing the instructions actually given, we cannot conclude that the instructions were incomplete without the supplemental instruction.

*Sufficiency of Evidence.*

Graves' final assignment of error is that the State failed to present sufficient evidence to convict him of terroristic threats. He argues that given the context of his relationship with Berryman that has "stretched over decades" and Berryman's delay in contacting police, the evidence was insufficient to convict.

It is unclear exactly how Graves believes his past relationship with Berryman lessens the strength of the State's evidence. Graves and Berryman were married in 1998 and divorced in 2004. Graves then moved to Arizona, and except for his son's marine boot camp graduation in 2010, he has not seen Berryman in person since their divorce. Despite not seeing Berryman for approximately 10 years, he continued to argue with her over child-related matters, as evidenced by the phone calls and text messages in this case. His past conduct led Berryman to seek a protection order in 2010 based on allegations of conduct similar to that at issue here. If anything, the history of Graves' relationship with Berryman shows the parties' animosity toward each other, which in no way undermines the strength of the State's evidence. See *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990) (holding that there was sufficient evidence to convict the defendant of terroristic threats based upon the language of his threats and the circumstances of his past relationship with the victim).

Furthermore, Berryman's delay in contacting the police has no relevance to Graves' conviction of terroristic threats. The terroristic threats statute does not require that the recipient of the threat actually be terrorized; rather, it requires that the actor have the intent to terrorize another as a result of the threat. *Id*. Thus, even if we construed Berryman's delay in contacting police as an indication that initially she did not take Graves' threat seriously, this has no relevance to the issue of whether Graves intended to terrorize Berryman when he threatened to "shoot her up with an AK-47."

Given the language of Graves' threat to Berryman ("I will find you and I will shoot you up with an AK-47 or whatever") and the circumstances surrounding the making of the threat, a rational trier of fact could have found Graves guilty beyond a reasonable doubt of terroristic threats. Graves made the threat on Berryman's voicemail following a phone call during which he was clearly angry and said, "I know where you're at," "I will come and find you," "I have nothing here in Phoenix," and "We'll do it the hard way." The threat also came in the midst of a series of text messages repeatedly referencing "$50k" and "50 graves." All of these statements and text messages could reasonably be construed as threatening and are circumstantial evidence that Graves had the intent to terrorize when he made the AK-47 comment on Berryman's voicemail. See *id*. at 969, 458 N.W.2d at 243 ("[T]he intent with which an act is committed involves a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.").

Graves' defense theory at trial was that he was referencing the allegations of a 2010 protection order when he made the AK-47 comment. However, the wording of Graves' threat did not support this theory. Graves said, "I *will* find you and I *will* shoot you up with an AK-47" (emphases supplied), which in no way suggests a reference to an allegation of past conduct. Although the threat ended with "or whatever," it was for the jury to decide the impact of this phrase

- 6 -

on the evidence, and we will not reweigh the evidence on appeal. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013). Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## CONCLUSION

For the reasons stated, we affirm the judgment of the district court for Sarpy County.

AFFIRMED.